# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| **MARLA A. KAYS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **1:03-cv-735-SEB-VSS** |
| **vs.** | ) | |
| | ) | |
| **PENSKE LOGISTICS, INC., PENSKE** | ) | |
| **LOGISTICS, LLC, PENSKE TRUCK** | ) | |
| **LEASING CORPORATION, PENSKE** | ) | |
| **TRUCK LEASING, L.P.,** | ) | |
| | ) | |
| **Defendants.** | ) | |


## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


This case is before us on the Motion for Summary Judgment filed by the Defendants, Penske Logistics, Inc., Penske Logistics, LLC, Penske Truck Leasing Corporation and  Penske Truck Leasing, L.P. (hereinafter referred to collectively as "Penske").[1]  For the reasons detailed in this entry, we hold that Defendants' motion is well taken and grant summary judgment in their favor.

---

[1]Defendants assert that Penske Logistics, LLC is the only appropriately named Defendant in this employment litigation because Penske Logistics, LLC was Plaintiff's employer, while the other three named Defendants are parent entities and a predecessor.  Plaintiff rejoins that because Defendants refer to the various entities generically as  "Penske," they "must be held liable for creating any confusion."  We are aware of no legal basis for liability to attach to a sibling or parent corporation as a result of an employer referring to itself by a shorthand name.  More importantly, the relationship among Defendants has absolutely no bearing on the substantive issues in this case nor on our decision regarding whether Plaintiff's employer violated Title VII of the Civil Rights Act of 1964.  Consequently, in this order we shall refer to Plaintiff's employer, as well as all Defendants, as Penske.

I.    *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of *some* alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, nor the existence of some "metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).

## II.    *FACTUAL BACKGROUND*

Pursuant to the requirement that we construe the facts in a light most favorable to the non-moving Plaintiff, we summarize them here primarily on the basis of Plaintiff's affidavits and depositions.[2] Defendants' affidavits and depositions have been used as sources of factual detail only as necessary to fill any gaps in Plaintiff's narrative. However, we have disregarded those

---

[2]We defer to Plaintiff's version of the facts despite Plaintiff's failure to comply with our local rule requirement that a section of the briefing labeled "Statement of Material Facts in Dispute" be specifically included which "responds to the movant's asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment." S.D. Ind. Local Rule 56.1(b). By failing to include such a section in the brief or making any real effort to highlight the material conflicts in the evidence, it is difficult for the Court to sort through and determine the material facts. Counsel risks our adoption of the facts asserted by the moving party, which is the prescribed consequence in subsection (e) of the local rule when a responding party fails to follow subpart (b).

portions of any affidavits that run contrary to the requirements that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matter stated therein." FED. R. CIV. P. 56(e). With those boundaries established, we explicate the facts of this dispute below.

In March, 1995, Marla Kays began work at ERX Logistics ("ERX") as a transportation clerk at the Indianapolis Local Distribution Center ("LDC") where she was eventually promoted to the position of warehouse leader. In January 1999, Penske, a company providing transportation and logistics services to customers throughout the United States, purchased ERX and took over its accounts. Subsequently, Penske promoted Kays to manager of the Indianapolis LDC, making her responsible for the daily supervision of all employees and daily operations at the LDC facility.

Penske LDC in Indianapolis serviced Whirpool appliance accounts. It received home appliances from a regional center in Ohio and distributed these products to retailers and private homes. Penske employed two categories of drivers to transport the appliances. First, line haul drivers were responsible for supplying the Indianapolis LDC with appliances from Penske's regional distribution center in Columbus, Ohio. Two line haul drivers, who worked evenings, supplied the Indianapolis LDC during the period of Kays's employment. Second, regular daytime drivers were primarily responsible for delivering and installing the appliances that had been transported by the line haul drivers from Columbus to the Indianapolis. The Indianapolis LDC had four regular daytime drivers. Both categories of drivers were subject to the Federal

Motor Carrier Safety Regulations issued by the U.S. Department of Transportation, which limited the number of hours per day and the number of days per week drivers could legally operate their vehicles.[3]  49 C.F.R. § 395.3.  As warehouse leader, Kays made the load assignments to the regular daytime drivers and monitored their hours of service.  The line haul drivers reported to Mike Varkonda, a Penske manager located at the regional distribution center in Ohio.

In order to monitor drivers' hours of service, Penske utilized for the most part the XATA system which it had inherited from ERX.  XATA tracks and records shift activity by means of a computer key that the driver inserts into his or her truck at the beginning of each shift, which records the time that the truck is in motion as well as when it is stopped.  At the end of each shift, the driver transfers the XATA key to a central computer in the LDC office that downloads the shift data, including the driver's hours of service, on-duty time, driving time, and available hours of service remaining for the following day.  The system also registers any hours-of-service violations that may have occurred during a shift.  On occasion, drivers forget to use the key properly or to enter certain information manually, requiring Kays to edit the computer records in order to correct the driver error or to add information which drivers had neglected to enter during their shifts.  Kays had received no formal XATA training, relying instead on the XATA user's manual and advice of other location managers using the system to perform these tasks.  The fact that some drivers used paper time logs rather than the XATA computer was a further

_____

[3]For example, during the relevant time period, the regulation limited drivers to no more than 10 hours of driving following eight consecutive hours off duty.  49 C.F.R. 395.3(a)(1). Also, drivers could not drive after being on duty (driving or not driving) for 70 hours in any given eight day period.  49 C.F.R. 395.3(b)(2).

complication, though these drivers were also required to submit their logs at the end of each shift so that hours of service could be tabulated as well as their remaining hours of service.

In 2001, the Regional Distribution Center (RDC) in Ohio[4] initiated a change in personnel management policy, whereby the evening line haul drivers who delivered appliances from RDC to the various LDC facilities took direction and received general supervision from the various LDC managers, including Kays in Indianapolis, but these drivers continued to report to the RDC to receive their dispatch assignments.

In March 2001, driver Mark Duff complained to line haul driver James Terrell about the condition of the vehicle they shared, during which exchange Duff referred to Terrell, who is African American, as "Buckwheat." Terrell, in response, threatened to "beat Duff's ass." On March 9, in the wake of this incident, Kays met with both Duff and Terrell to review company policies and procedures, admonishing them to come to her in the future if issues arose between them, rather than trying to settle them on their own. Later that month, after Terrell had complained to Kays that other drivers were drinking on the job, Kays met to discuss this issue with the drivers and revealed to them that Terrell was the person who had lodged the complaint. This disclosure caused Terrell to be rude and short-tempered in his subsequent interactions with Kays and the other drivers, including at one point the accusation that Kays was racist based on her having singled him out for harassment.

------

[4]The RDC in Ohio was actually a Whirpool warehouse facility, but Penske line haul drivers and a manager worked out of that location.

On August 13, 2001, Terrell filed a charge of discrimination against Penske with the Equal Employment Opportunity Commission (EEOC), alleging that Kays had created a racially hostile work environment.  During its internal investigation, Penske discovered that Kays had instructed the drivers under her supervision not to talk to Terrell unless it was "work related." Penske also learned that Kay had used vulgar language toward Terrell following his filing of his charge with the EEOC, and, at a later point, had become upset with Terrell to such an extent that she told him, "You're next."  When confronted with these findings, Kays admitted them and signed a written warning issued by Penske that detailed her inappropriate conduct.  Though Kays cooperated with Penske's remedial plan, her relationship with Terrell thereafter remained tense.

In September 2001,  Kays complained to Penske's area manager, Jim Christensen,[5] and to Mike Varkonda that Terrell was refusing to take direction from her because she is a woman. Varkonda had instructed Terrell on several occasions that he must report to Kays.  Several Penske management officials were enlisted to work with Kays to resolve issues relating to her strained relationship with Terrell, which generated various e-mail exchanges among them and Kays.  In one of these exchanges, Varkonda agreed to participate by telephone in a meeting between Kays and Terrell at which Kays gave Terrell a verbal warning regarding his recent performance.  After the meeting, Kays expressed her appreciation to Varkonda for his participation with her by phone.  Thereafter, Terry Cooley, Penske's Human Resources Manager, informed Kays that Terrell had contacted him to complain of renewed harassment by Kays,

---

[5] Kays initially reported to Jim Christensen; on January 1, 2002 she began reporting to John Stucky.

prompting Kays to thank Cooley for having alerted her and to state that she had "learned a lot from all of you on how to handle this situation."

On March 5, 2002, Kays again met with Terrell to give him a written warning regarding various disciplinary problems.  Louisville LDC manager Tony Mills also attended that meeting, during which Terrell became so angry he announced he would not drive his route that evening. Stucky learned of Terrell's actions after consultation with Kays, Mills, and Varkonda and decided that Terrell's employment should be terminated due to his job abandonment.

During the time period when the events surrounding Terrell's termination unfolded, two drivers and an assistant, all under Kays's supervision, requested vacation time for the same week in March of 2002.  The drivers, Robert Haynes and Allen Dryden, also requested leave on the preceding Friday (Good Friday).  Kays was desirous of granting these requests but was concerned that she would be unable to get other drivers to cover for them in their absence.  She e-mailed Stucky for guidance, indicating that the requested time off was "March 29th thru April 5th - Spring Break."  Stuckey responded indicating that the decision to grant or deny the request was ultimately hers, whereupon Kays granted the three employees' requests for a week's vacation; there is a dispute, however, as to whether in the process she also granted the drivers' request to be off work on March 29, which was Good Friday.[6]

During a drivers' meeting on March 14, Kays announced that, because she had granted vacation time for the three employees, the LDC would be short-handed the week following

---

[6]As we explain below, this disagreement does not rise to the level of a dispute of material fact for the purposes of the instant motion for summary judgment.

Easter.  On March 21, Kays e-mailed Stucky to request the assignment of an additional driver to help with the high volume at Indianapolis, but Stucky did not provide one.  On the day before Good Friday, Kays telephoned Haynes and Dryden to give them their route assignments for the next day, but neither driver returned her call and the two drivers did not show up for work on Good Friday.

Mills traveled to Indianapolis on April 5 (the Friday following Good Friday) to assist Kays in interviewing applicants for a new driver's position.  While there, Kays informed Mills that Haynes and Dryden had not worked their scheduled shifts on the previous Friday.  Mills consulted with Cooley and Stucky regarding the absences of Haynes and Dryden, and Stucky authorized Kays to terminate the employment of Haynes and Dryden upon their return from vacation.  During this same week, driver James Russo called the office to state that he was in danger of violating his hours of service limit.  Kays did not know whether this was in fact true because Russo was using paper logs rather than the XATA system to record his time, and he had failed to record his hours in the office.  Responding to Russo's report that he was running out of service hours, Kays told him to be a "team player," which Russo interpreted as encouragement to violate the hours-of-service regulation; in her affidavit, Kays stated that she meant that Russo should turn in his paper logs so she could track his hours and plan accordingly.  While these statements of intention and interpretation differ, they do not constitute a disputed material fact, as we explain below.

When Haynes and Dryden returned to work on April 8, Kays terminated their employment for their failures to work on Good Friday (March 29).  When Kays presented

Haynes with a box containing his personal belongings, he threw the box at her and made several disparaging and vulgar remarks, including calling her a "bitch."  In response, she marked his termination form "not eligible for rehire."

Sometime over the next two days, Russo telephoned Stucky to inform him of his conversation with Kays during which Kays had told Russo to be a "team player."  Russo also complained about Kays's termination of Haynes and Dryden.  Stucky requested that Russo provide him with a written version of his conversation with Kays regarding his hours.  Russo's written statement prompted Stucky to conduct a further investigation, and, on April 22, Stucky told Kays that he and Dennis Hartweg, Penske's safety manager, were coming to the Indianapolis LDC on April 24 to conduct an unscheduled audit of the XATA records.  Kays objected to the audit, noting that it was a busy time and she was understaffed.  Nonetheless, Penske proceeded with the audit.

In the course of his investigation, Hartweg found numerous hours-of-service violations, a significant number of edits to the XATA system, a failure to perform monthly log audits, and a failure to follow up on deficiencies uncovered in an earlier safety audit.  Hartweg recorded his findings and delivered them to Stucky, along with copies of the XATA records he reviewed.

On the second day of the audit, Stucky interviewed the remaining regular daytime drivers regarding their hours-of-service.  Russo informed Stucky that he had heard Kays discussing with her assistant a method by which hours-of-service violations could be edited out of the XATA system.  He further stated that Kays instructed drivers to clock out and not clock back in until their trucks were fully loaded and ready for delivery.  Russo further explained that while riding

with Phil Garvin, a driver who had been reprimanded for hours-of-service violations, he heard Kays tell Garvin to finish his shift, even though he was running out of legitimate hours, and she would edit the XATA system.  Duff told Stucky that Kays set up driver schedules with more work than could be accomplished during the time limits prescribed by federal regulations and that Kays would get angry if the work was not completed.  According to Duff, Kays instructed drivers to load their trucks fully before engaging the XATA key.  He also stated that Kays had told him to drive illegally and that she would correct the violations in XATA later.  After the audit and interviews, Stucky and Hartweg telephoned Cooley to discuss their findings.  Their discussion concluded in an agreement among all three managers that Kays had violated federal regulations and Penske policy and that her employment should therefore be terminated.

During Stucky's  interviews, some of the drivers made mention of their view that Haynes had been unfairly discharged; (the drivers did not contest Dryden's termination).  The drivers who were present at the March 14 meeting said that Kays had approved Haynes's request for leave on Good Friday as well as for Spring Break.  The drivers and office staff related this same information to Mills after he had assumed Kays's responsibilities.  Based on these findings, Stucky authorized Mills to rehire Haynes, subject to a probationary period, beginning May 2002, approximately one month after Kays's termination.

## III.  ANALYSIS

A.    _Appropriate Defendant_

As we alluded to in Footnote1, _supra_, Penske Logistics, LLC, is the only proper defendant in this action.  The other named companies, Penske Truck Leasing Corp. and Penske Truck Leasing Co. LP, are not proper defendants because they played no role in Kays's employment or her termination.  To be a proper defendant in a Title VII action, a company can be implicated in one of only three ways:  (1) if plaintiff has evidence that the company maintained an employment relationship with plaintiff; (2) if plaintiff, by piercing the corporate veil, has evidence that the company is the alter ego of plaintiff's employer; or (3) if plaintiff has evidence that the company took actions to avoid liability under the discrimination laws or might have directed the discriminatory act, practice, or policy of which plaintiff complains.  _Worth v. Tyler_, 276 F.3d 249, 259-60 (7th Cir. 2001).

In _Worth_, the Seventh Circuit analyzed five factors comprising an "economic realities test" to determine whether an alleged victim of sexual harassment was an employee of the defendant company and thereby had a right to sue under Title VII: (1) the extent of employer's control and supervision over the worker, including direction and scheduling; (2) the kind of job and skills required to carry out the work and whether those skills were learned at the workplace; (3) the responsibility for cost of the operation, _i.e._, who paid for equipment, supplies, fees, licenses, and general maintenance; (4) the method and form of payments and benefits; and (5) the length of the job commitment or expectations.  _Id._ at 263 (_citing Knight v. United Farm Bureau Mut. Ins. Co._, 950 F.2d 377, 378-79 (7th Cir. 1991)).  The most important factor, the

-12-

Seventh Circuit declared, is the company's ability to control and direct the worker's actions. *Id.*; *accord, Alexander v. Rush North Shore Medical Center*, 101 F.3d 487, 492-93 (7th Cir. 1996).

In the instant case, Penske's payroll forms identify Kays as an employee of Penske Logistics, LLC.   Penske Logistics, LLC maintains its own human resources department, which is "controlled by and devoted exclusively to Penske Logistics, LLC employees."   Furthermore, the drivers under Kays's supervision were also employees of Penske Logistics, LLC, and, similarly, the supervisor to whom Kays reported was an employee of Penske Logistics, LLC. All three managers who participated in the decision to terminate Kays's employment were employees of Penske Logistics, LLC.  Tellingly, Kays offers no evidence that the other named defendants (Penske Logistics, Inc., Penske Truck Leasing Co., L.P. or Penske Truck Leasing Corp.) had any involvement in the daily management of Kays's employment or her discharge.

She does cite several facts that she maintains justify her pursuit of all four defendants, namely that: 1) all four defendant companies have the same distinctive corporate address; 2) all four companies are represented by the same lawyers; and 3) the defendants refer to themselves individually and collectively as "Penske."   In conclusion, she asserts, "[A]ny confusion in the identities of the entities has been caused by the defendants and they must be held liable for creating any confusion in plaintiff and the public."  This theory is far from sufficient as a basis of liability.  Neither Plaintiff's nor arguably the public's confusion (which has not been established as a fact in this litigation) establishes an employer-employee relationship under any applicable principles of Seventh Circuit jurisprudence.  Therefore, because Penske Logistics, LLC is the sole, proper defendant, the remaining defendants are entitled to summary judgment in their favor

-13-

as a matter of law.

**B.**     *Discrimination*

Kays alleges that Penske terminated her employment as manager of the Indianapolis LDC on account of her sex, in violation of Title VII of the Civil Rights Act of 1964.  Penske rejoins that Kays was terminated because her work performance was deficient when she compelled drivers under her supervision to drive in violation of hours of service limits mandated by the Department of Transportation, thereby placing Penske at risk of a shipping suspension.

Title VII of the Civil Rights Act of 1964 provides that it "shall be unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to [her] . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1).  A plaintiff in an action under Title VII may pursue her cause of action "under a direct or indirect method of proof." *Butts v. Aurora Health Care*, 387 F.3d 921, 924 (7th Cir. 2004); *see also Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  Direct evidence is that which, if believed by the trier of fact, proves discriminatory conduct on the part of the employer without reliance upon inference or presumption.  *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997).  A plaintiff who is unable to prevail under the direct method must proceed under the indirect method, *i.e.*, the *McDonnell Douglas* burden-shifting test.  *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).  If the plaintiff is able to establish a *prima facie* case of discrimination, the burden of production then shifts to the defendant to show a legitimate and nondiscriminatory reason for taking the adverse action.  *Farrell v. Butler University*, 421 F.3d 609, 613 (7th Cir.

2005).  If the defendant is able to do so, the burden of production shifts back to the plaintiff to show that the defendant's explanation is pretextual.  *Id.*  "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, [and] so long as [the employer] honestly believed those reasons, pretext has not been shown."  *Id.* (internal quotation marks omitted). Pretext is a "dishonest explanation, a lie rather than an oddity or an error."  *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000).

In order to establish a *prima facie* case of sex discrimination, Kays must show that (1) she is a member of a protected class; (2) she was meeting Penske's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated male colleague.  *Farrell*, 421 F.3d at 613.  Both parties concede that Kays is a member of a protected class, *i.e.*, she is female, and that she suffered an adverse employment action when Penske terminated her employment on April 25, 2002.  Thus, in order to establish a *prima facie* case of discrimination, Kays must establish that she was meeting Penske's legitimate performance expectations and that she was treated less favorably than a similarly situated male colleague.  We examine each of these factors below.

### 1.       Legitimate Performance Expectations

Kays points to previous audits and job performance evaluations to demonstrate that she was meeting Penske's legitimate performance expectations at the time of her termination.  She neglects, however, to mention that she received a written warning for mismanagement regarding her original handling of the Terrell situation.  Kays's prior performance record in any event is not in itself dispositive because her past promotions, raises, or average evaluations do not

conclusively establish that Kays was meeting the legitimate expectations of Penske at the time of

her discharge.  *See Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 401 (1992) (previous pay

raises not indicative of whether the employee was meeting his employer's legitimate

expectations because "[w]hat matters is whether [plaintiff] was meeting his employer's

expectations *at the time of his discharge.*") (emphasis in original);  *Karazanos v. Navistar Intern.*

*Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991) (holding that the focus rests on plaintiff's

performance at the time of termination because "the fact that an individual may have been

qualified in the past does not mean he is qualified at a later time.") (quoting  *Grohs v. Gold Bond*

*Bldg. Products, A Div. Of Nat. Gypsum co.*, 859 F.2d 1283, 1287 (7th Cir. 1988)).  That said, an

employer may not invoke this doctrine to justify the view that anytime it fires an employee it is

because the employee is not meeting its expectations; otherwise, "the requirement . . . would be

meaningless."  *Pilditch v. Board of Educ. Of City of Chicago*, 3 F.3d 1113, 1117 (1993).  "The

more relevant question is whether the employee is able to put on objective evidence that [she] is

sufficiently competent to satisfy the legitimate expectations of an employer."  *Id.*

     Here, as we have previously noted, Kays was reprimanded for her mismanagement of

Terrell, but she did follow her supervisor's recommended steps to remedy that situation. Kays

also maintained e-mail contact with Stucky and other Penske HR staff regarding ways to

ameliorate her continued tense working relationship with Terrell.  Stucky's reference to Kays as

"high maintenance," does not necessarily connote substandard performance on her part, any

more than it constitutes evidence of a sex-based discrimination.  Putting aside for the moment

the findings from the XATA audit and from Stucky's driver interviews, Kays has adequately

demonstrated that she was meeting Penske's legitimate expectations at the time of her

-16-

termination.  Nonetheless, Penske's non-discriminatory reason for terminating her employment trumps that preliminary conclusion and there is no evidence of record to counter Penske's explanation either of the accuracy or the significance of the safety audit. Consequently, at the time Kays's employment was terminated, her performance had sunk below management's legitimate expectations.

### 2.    Less Favorable Treatment

Kays references several male employees whom she contends had performance problems but received more preferential discipline, arguing that this disparity in treatment establishes that Penske's less favorable treatment of her was on account of her sex.  A review of these comparisons discloses, however, that the males to whom she has compared herself were not in the same job position, were not performing under the same supervisor, and were not determined to have committed acts of similar or worse gravity.  To determine whether two employees are similarly situated, we are required to examine all factors relevant to the position.  *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000).  Kays need not show that she was identical in every respect to the employee whose comparative treatment she proffers, but she must show a substantial similarity in all material respects.  *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).  The lack of a common supervisor usually precludes a showing of similarity because when "different decision-makers are involved, two decisions are rarely similar in all respects."  *Snipes v. Illinois Dept. of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002) (*quoting Radue v. Kimberly-Clark Corp.*, 219 F.3d 612 (7th Cir. 2000)).

Kays bases her *prima facie* case primarily on comparisons between herself and five

employees:  Jim Christensen, Chris Gonia, Don Hamaker, James Terrell, and Mike Varkonda.

Under the holding in *Snipes*, Christensen, Gonia and Hamaker must be eliminated from

comparison because none was supervised by Stucky.  Even if the *Snipes* exception were not

applied, Hamaker's demotion from his position as LDC manager at Columbia, Maryland, was

precipitated by unrelated ongoing issues pertaining to inventory accuracy, timeliness of delivery,

and reporting accuracy.  While these problems no doubt impeded the efficiency of Penske's

operations, none rises to the level of a violation of federal regulations that could result in so

serious a consequence as a suspension of the shipping fleet.  Furthermore, Kays provides no

evidentiary support for her allegation that Christiansen's demotion was caused by his

performance problems.  And, while Penske clearly had performance concerns with regard to

Gonia's monitoring of driver's hours of service at its Benton Harbor, Michigan location, the

highly relevant distinction between Gonia's performance and Kays's is that neither Gonia nor

any of the other supervisory employees to whom Kays compares herself was accused of

encouraging or inviting or otherwise condoning violations of the regulations.

     Kays also compares her treatment to that of Terrell.  Since Kays was Terrell's supervisor,

this comparison is inapt on its face.  Managers are not similarly situated to their subordinates.

*See Sarsha v. Sears, Roebuck, & Co.*, 3 F.3d 1035, 1042 (7th Cir. 1993).  Furthermore, Terrell

was disciplined and ultimately terminated for his misconduct.  In fact, Kays concedes that

Penske responded to her complaint of Terrell's ignoring her directions by instructing him that

she was still a supervisor and he needed to respond to her direction accordingly.  E-mail

correspondence regarding Terrell's disciplinary issues establishes that Penske meted out

punishment against him on occasions when and as  Kays suggested it, as well as on other

occasions when she was not the instigator.  This comparison therefore does not support Plaintiff's theory or argument.

Kays also compares her treatment to that accorded Varkonda, noting that Varkonda was not punished for discrepancies that appeared during the XATA audit which were traceable to one or more  employees under his supervision.  In his deposition, Stucky explained that these were not hours-of-service violations but rather errant entries by a new driver in training, who had been hired to replace Terrell.  In addition, there was no evidence to indicate that Varkonda had encouraged or covered up violations of federal regulations.

Kays further claims that the manner in which Stucky conducted the surprise audit reflects Penske's less favorable treatment of her due to her sex.  She represents that she had never previously heard of any safety audit being conducted on an unannounced, surprise basis.  However, Kays has not been able to link her sex either to the audit or to her subsequent termination.  The safety audit occurred in response to serious allegations concerning Kays's supervision of the Indianapolis LDC, and because Kays was the object of the investigation, it would not have been reasonable to include her either in the XATA audit process or during the individual driver interviews.  From the information gathered from the drivers' interviews  as well as that extracted from the computers, Stucky, Hartweg and Cooley concluded that Kays had at least allowed and perhaps compelled drivers to violate the hours-of-service limitations and thereafter attempted to alter the records to conceal the violations.  The process by which Kays was terminated, *i.e.*, after a supervisor conferred with an uninvolved manager who then made the decision regarding termination, is identical to the manner in which Kays had terminated the

employment of Haynes and Dryden.  While these drivers were subordinates of Kays and therefore not appropriate "comparables" for purposes of a disparate treatment analysis, the similarity in termination procedures also demonstrates the regularity of the process Penske applied to Kays's termination decision.

Kays contends that, had the goal of the audit actually been safety, Penske would have followed up with training and improvement strategies, which it did not.  This theory ignores the fact that Stucky and Hartweg, who had been detailed to investigate the allegations that Kays had compelled drivers to violate federal law, reported their findings to Penske on the basis of which Kays's employment was terminated.  Clearly, the safety problems they uncovered were corrected when the person they believed to be responsible for them was terminated.  We invoke the oft-cited language from our circuit's prior rulings to remind Plaintiff that the Court does not "sit as superpersonnel department . . . (to) second guess an employer's business decision," even if that decision was baseless or mistaken, so long as the reason for the decision was honestly believed by the employer.  *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001).  There is no evidence to support Plaintiff's claim of discrimination with regard to her termination of employment.

**C.**     ***Retaliation***

In order to survive a motion for summary judgment under the indirect method of proving a retaliation claim, a plaintiff must show that "(1) she engaged in statutorily protected activity;

(2) she was performing her job according to [her employer's] legitimate expectations; (3) despite her satisfactory performance, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004). "Absent direct evidence of retaliation, failure to satisfy any element of the *prima facie* case proves fatal to the employee's retaliation claim." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002).

Kays asserts that the manner in which the audit was conducted, the proximity in time between her complaint and the audit and her termination, and her previous complaints regarding Penske's tolerance of Terrell's abusive behavior towards her all serve as evidence of her retaliatory termination. We are not persuaded by this argument.

Recounting again the salient facts, in September 2001, Kays complained that Terrell was refusing to follow her directions in the workplace because of her sex. This occurred seven months prior to her termination. The Seventh Circuit has ruled that, as the time between the protected activity and the adverse employment action increases, the ability of a jury reasonably to infer discrimination decreases. *Lalvani v. Cook County*, 269 F.3d 785, 790-91 (7th Cir. 2001). It is also noteworthy that these events occurred shortly after Terrell filed his EEOC complaint of racial discrimination based on Kays's conduct, which fact undermines Kays's speculation that the reason he ignored her directions was her sex, as opposed to his belief that she was a racist. Furthermore, Kays's complaints regarding Terrell occurred at approximately the same time she had spoken to him about his use of vulgar language, to which she had cryptically responded,

-21-

"You're next."  Penske's generally supportive actions of Kays's supervision of Terrell further

undermine Kays's claims of retaliation.  Varkonda had informed Terrell that, despite his

conflicts with Kays, he must still take direction from her.  And during this period, Kays not only

exchanged several e-mails with her supervisor and the human resources department concerning

how best to deal with Terrell, after the problems were resolved she thanked them for their help.

This evidence simply does not substantiate Kays's theories either that Penske tolerated Terrell's

behavior or that her complaints about Terrell provided a basis for her discharge.

As discussed above, the "surprise" safety audit occurred in response to serious

allegations concerning Kays's supervision of the drivers at the Indianapolis LDC.  When the

audit of the XATA records began and Stucky interviewed the drivers under Kays's supervision,

Kays asserted that Stucky would not be conducting the audit if she were not a woman.  Stucky

denied this allegation that her gender had prompted the audit, indicating further that he did not

appreciate the comment.[7]  Even though she was terminated the day after the audit, temporal

proximity alone does not necessarily create a triable issue of fact.  *Buie v. Quad/Graphics, Inc.*,

366 F.3d 496, 506-07 (7th Cir. 2004).  In *Buie*, the Seventh Circuit rejected plaintiff's claim of

discriminatory discharge which followed his announcement that he had AIDS.  The court

credited plaintiff's poor attendance as persuasive, indicating that Plaintiff had every reason to

believe he was about to be fired when he made his announcement.  *Id.* at 507.  The court found

---

[7]After Kays leveled this charge that the audit was motivated by her gender, Stucky
reported Kays's complaint to Cooley at Human Resources.  Kays says that "Penske did not
conduct any investigation of her complaint."  (Pl. Br. in Opp. to Mot. for Summ. J. at 16).  We
find no support for this representation in the record.  In his deposition, Stucky testified that no
remedial action had been taken in response to the complaint, not that it went uninvestigated.

no triable issue, reasoning that an "[eleventh] hour declaration of disability does not insulate an unruly employee from the consequence of his misdeeds." *Id.*

In the case at bar, when confronted with the findings of the audit, Kays declared that she had not been trained by Penske concerning Department of Transportation regulations.  In her deposition, she conceded that this claim was untrue and  that in fact she made the claim "as a resource to save her job." Accordingly, we are not impressed by Kays's claim that the audit was gender based and view it merely as an attempt to deflect anticipated criticism in order to retain her job.  Her protestations to the contrary ignore the fact that she had been accused of excusing and encouraging federal regulatory violations, a finding that portended very serious consequences to Penske.  Whether the XATA findings were incorrect or the drivers lied to Stucky in their interviews is, in the final analysis, immaterial.  We are not authorized to second guess an employer's legitimate business decisions.  The touchstone for our acceptance of an employer's basis for termination is not its reasonableness or its wisdom, but whether the employer honestly believed it.  *Gordon,* 246 F.3d at 889.  Here, the evidence establishes to a certainty and without dispute that Stucky, Hartweg, and Cooley believed Kays had violated Penske work rules and based their joint decision to terminate her employment on that finding from the XATA audits and Stucky's driver interviews, and not on Kays's gender.

## IV.   CONCLUSION

"Without a *prima facie* case, the plaintiff cannot withstand summary judgment." *Hong v.*

*Children's Memorial Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993).  Here, Kays has failed to

establish a *prima facie* case of discrimination and of retaliation and has failed to show that

Penske's proffered reason for her termination was pretextual.  Accordingly, Penske's Motion for

Summary Judgment (Docket #47) is GRANTED and judgment consistent with this Entry shall

issue.

      IT IS SO ORDERED.

      12/09/2005

                                                        SARAH EVANS BARKER, JUDGE
                                                        United States District Court
                                                        Southern District of Indiana

Copies to:

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@fed-law.com

Alvin Jackson Finklea III
SCOPELITIS GARVIN LIGHT & HANSON
jfinklea@scopelitis.com

James H. Hanson
SCOPELITIS GARVIN LIGHT & HANSON
jhanson@scopelitis.com

David D. Robinson
SCOPELITIS GARVIN LIGHT & HANSON
drobinson@scopelitis.com

Tracy Lee Schrey
PENSKE TRUCK LEASING
tracy.schrey@penske.com